SHIPMAN *et al.* v. BANK OF THE STATE OF NEW YORK.

(*Supreme Court, General Term, First Department.* January 13, 1891.)

1. BANKS—PAYMENT OF FORGED CHECKS—LIABILITIES.
    Plaintiffs, a firm of attorneys, placed their real-estate department in charge of B., subject to the supervision of a member of the firm. B. would examine the titles to the real-estate upon which moneys were loaned by plaintiffs' clients; and upon his statement showing existing liens, and the amounts required to remove

them, checks would be drawn by plaintiffs, and issued to B., to be deliverable only as against the mortgages. By fraudulent statements, B. obtained 27 checks from plaintiffs, drawn on defendant bank, for amounts aggregating nearly $200,000, and forged the indorsements of the payees, most of whom were fictitious persons, and appropriated the proceeds. Upon such forged indorsements, the checks were paid by defendant. During the four years covered by B.'s crimes, plaintiffs' pass-book with defendant was written up 18 times, and on nearly every occasion one or more of the forged checks were returned by defendant. Seventeen of the checks bore also the personal indorsement of B., and passed into his private account with other banks. The remaining ten were delivered by B. to one H., and deposited in the latter's bank. When the plaintiff's pass-book was written up, it went into the hands of their cashier for examination. *Held,* that defendant was responsible to plaintiffs for the amount of the checks.

2. SAME—NEGLIGENCE OF DRAWER.

Plaintiffs were not chargeable with negligence in omitting to examine the forged indorsements, or in placing too much confidence in B.

3. SAME—PAYMENTS BY FORGER.

Defendant could not avoid liability on certain of the checks by showing that parties who had claims against plaintiffs for moneys represented by the checks, and in whose favor they were drawn, had since been paid the amount of their claims by B.

Appeal from judgment on report of referee.

Action by William D. Shipman and others, composing the firm of Shipman, Barlow, Larocque & Choate, against the Bank of the State of New York. There was judgment for plaintiffs for the full amount claimed, and defendant appeals. The following is the opinion of the referee, Hamilton Cole:

"On April 7, 1884, the defendant, a banking corporation, was indebted to the plaintiffs in the sum of $14,499.08, upon a balance in their favor of moneys deposited by them with the defendant. Thereafter, and between that date and the 3d day of October, 1888, the plaintiffs deposited other moneys with the defendant, amounting in the aggregate to the sum of $6,213,586.71. They allege that of these sums the defendant has paid to them, or on their orders, only the sum of $6,030,040.29, and that the balance, to-wit, $198,-045.50, the defendant has refused to pay, although payment has been demanded. To recover this latter sum this action is brought. The defendant denies the alleged indebtedness, and avers payment of the entire sum in dispute on the written checks or orders of the plaintiffs. That such checks were drawn by the plaintiffs, and that they were paid by the defendant, and charged against the plaintiffs' account, are facts in the case; but the plaintiffs contend that such payments were wrongfully made, because not made to the parties in whose favor such checks were drawn, or to their transferees, but to persons having no title to the checks, and no right to demand or receive payment thereof, but who claimed title and demanded payment through or under forged indorsements of the several payees. The relation of banker and customer in respect of deposits is defined and settled by abundant authority, and is not a matter of contention in this case. 'When deposits are received, they belong to a bank as part of its general funds, and the bank becomes a debtor to the depositor, and agrees to discharge the indebtedness by paying the checks of the depositor, his creditor. The contract relation between the parties is purely legal, and has no element of trust in it.' *Ætna Nat. Bank* v. *Fourth Nat. Bank,* 46 N. Y. 86. 'All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter, and that other kind of deposit of money, peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money and loans it to the bank, and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand.' *Marine Bank* v. *Fulton Bank,* 2 Wall. 256; *Phœnix Bank* v. *Risley,* 111 U. S. 125, 4 Sup. Ct. Rep. 322. The proposition insisted upon by the learned counsel for the plaintiffs is therefore true. A bank, in honoring the check of a depositor,

does not pay it out of moneys belonging to the depositor, but out of its own moneys.  It does not thereby restore to the depositor a portion of funds which it holds for him, or as his trustee, but it pays *pro tanto* its indebtedness to him arising out of his 'loan' of his 'deposits' to the bank.   When the Corn Exchange Bank paid Kunhardt & Co.'s check to a party claiming through a forged indorsement, it did not use Kunhardt & Co.'s money for that purpose. 'Their money [the court said] was still on deposit with the plaintiff, and the plaintiff owed them for it.'   *Corn Exchange Bank* v. *Nassau Bank*, 91 N. Y. 80; *Bank of British North America* v. *Merchants' Bank*, 91 N. Y. 111. It is also true that a bank's indebtedness to its depositor can be discharged only by payment either to him, or to the person or persons to whom he directs it to be paid.   Care and diligence on the part of the bank in determining whether the party who demands the payment is entitled to receive it are of no importance as respects the depositor.   Its liability to him is absolute.   It makes every payment at its own risk, and it can charge him with only such payments as it makes to him, or in accordance with his directions.   In 'debiting his account, it is not entitled to charge any payments except those made at the time when, to the person whom, and for the amount, authorized by him.   It receives the depositor's funds upon the implied condition of disbursing them according to his order, and upon an accounting is liable for all such sums deposited as it has paid away without receiving valid direction therefor.'   *Crawford* v. *Bank*, 100 N. Y. 53, 2 N. E. Rep. 881.  The signature of its customer the bank is bound to know, and it must bear the loss if it pays a check with a forged signature, no matter how well it may be simulated. *Weisser* v. *Denison*, 10 N. Y. 68, *Frank* v. *Bank*, 84 N. Y. 214.   And when a genuine check is made payable to a person named therein, or to his order, the duty of the bank is equally imperative.   While not chargeable with knowledge of the payee's signature, it must 'see to it, at its peril, that it pays according to the terms of the order, and to the party named therein, or to one holding it under the genuine indorsement of such payee.'   *Dodge* v. *Bank*, 30 Ohio St., 1; *Welsh* v. *Bank*, 73 N. Y. 426; *Corn Exch. Bank* v. *Nassau Bank*, 91 N. Y. 80.   These well-settled propositions are not denied by the learned counsel for the defendant, but it is contended that the payment by the defendant of the checks in dispute has been adopted and ratified by the plaintiffs; that various accounts were stated and settled between the parties while the frauds in question were being perpetrated by Bedell; that in those accounts these checks were charged against the plaintiffs, and that the checks themselves were returned to the plaintiffs as vouchers for such charges; that the balance shown by each settlement to be due from defendant to the plaintiffs was accepted by the latter as correct, and the said vouchers were retained by them, either without examination, or with such partial and negligent examination that the said frauds were not discovered, as they might easily have been had the plaintiffs exercised reasonable and proper care; and therefore it is insisted, with great vigor, that the plaintiffs are estopped to question or dispute the validity of such payments by the bank.   The same claim was urged in *Weisser* v. *Denison*, 10 N. Y. 68, which was an action brought by a depositor against the North River Bank to recover the amount of certain checks to which the depositor's name had been forged by his confidential clerk, and which the bank had paid.   Judge JOHNSTON says that 'the defendant insisted at the trial that Weisser, by neglecting to examine the checks and bank account upon the return of the bank-book, written up and balanced by the bank, had adopted the checks as his own, and that by reason of his negligence in that respect the plaintiff could not recover from the bank the amount of the forged checks.'   It was held that the writing up of the bank-book, debiting in it the forged checks, and returning the book to Weisser with the vouchers, was the statement of an account by the bank, by which Weisser became bound as by an account stated; he having retained the account with_

out objection after a reasonable time for its examination had elapsed. ' This [the court said] is undoubtedly the result of his omission personally to examine his account, and take seasonable objections to improper items. Still, inasmuch as the defendant has not, by the silence of Weisser, been induced to take any action or lost any rights, the only effect of this is to cast the burden of proof upon Weisser and his representatives to show fraud, error, or mistake in the account. It is not conclusive, but merely *prima facie* evidence of the dealings between the parties.' And in *August* v. *Bank*, 1 N. Y. Supp. 141, the court said: ' When he, the dealer, failed to examine it, the whole consequence was that the burden of proof was shifted, and he became bound to show that the account was wrongly stated.' In compliance with this rule, the plaintiffs in the present case made proof that the indorsements of twenty-seven checks, drawn to order by the plaintiffs, and aggregating the amount in controversy in this action, had been forged by Bedell. Upon such forged indorsements, the checks were paid by the defendant. The proofs show these further facts: Bedell's frauds covered a period of about four years. During that period, and prior to the discovery of his crimes, the plaintiffs' pass-book with the defendant was written up thirteen times, and on each occasion, with one or two exceptions, one or more of the checks with false indorsements were returned by the bank to the plaintiffs along with a great number of other vouchers. Seventeen of these checks bore also the personal indorsement of Bedell, and passed into his private accounts with the Union, Phenix, and Continental Banks. The remaining ten were delivered by Bedell to one James S. Henry, and were indorsed by him, and deposited to his credit in the Broadway Bank. Three of the checks for small amounts were paid to Bedell by the defendant over the bank counter. The others reached the defendant in common course of business, through the settlements of the clearing-house. When the pass-book was written up and delivered with the vouchers to the plaintiffs, it went into the hands of Dodge, the plaintiffs' cashier, for examination. It is now claimed that the plaintiffs are responsible for and concluded by the negligence of Dodge, and that Dodge's negligence consisted in not observing that either Bedell or his friend Henry was the last indorser on these checks, which fact was notice that he (the last indorser) had received the proceeds. Ordinary care, it is said, would have discovered this fact. Had it been noticed, it would have provoked inquiry. If inquiry had been made, the frauds would have been revealed, and Bedell would have been checked on the threshold of his criminal career, and this enormous loss would have been prevented. This claim raises the question by which the plaintiffs' negligence must be determined. Is it the legal duty of a depositor, upon the return to him by a bank of his canceled checks, to make an examination of the indorsements which they bear? If it is, and he omits it, he must bear the consequence which results from his omission, and the negligence of the servant to whom he confides the duty is imputable to him.

"In *Weisser* v. *Denison*, cited above, the checks themselves were false, the name of Weisser, the apparent drawer, being forged. The court said that ' whatever loss the bank has sustained it has suffered from its own negligence or want of skill in a matter as to which, in the first instance, it, and it only, was bound to exercise skill and diligence. To this loss no act of Weisser has contributed. He was guilty of no bad faith. He has violated no duty which he owed to the bank, and is in no way responsible. * * * He was under no contract with the bank to examine with diligence his returned checks and bank-book.' The point there decided was stated with approval by ANDREWS, J., in *Welsh* v. *Bank*, 73 N. Y. 428, to be as follows: ' In respect to the question of negligence, it was held that a depositor owes no duty to a bank which requires him to examine his pass-book or vouchers, with a view to a detection of forgeries of his name.' The same question arose in *Frank* v. *Bank*, 84 N. Y. 209, which was also a case of forgery of the draw-

ers' signatures.   A recovery by the plaintiffs was sustained on the authority
of *Weisser* v. *Denison.*   But the court said: 'It does not seem to be un-
reasonable, in view of the course of business, and the custom of banks to sur-
render its vouchers on the periodical writing up of the accounts of depositors,
to exact from the latter some attention to the account when it is made up, or
to hold that the negligent omission of all examination may, when injury has
resulted to the bank, which it would not have suffered if such examination
had been made, and the bank had received timely notice of objections, pre-
clude the depositor from afterwards questioning its correctness.   But where
forged checks have been paid, and charged in the account, and returned to
the depositor, he is under no duty to the bank so to conduct the examination
that it will necessarily lead to the discovery of the fraud.   *   *   *   So, if
the depositor, in the ordinary course of business, commits the examination of
the bank account and vouchers to clerks and agents, and they fail to discover
checks which are forged, the duty of the depositor to the bank is discharged,
although the principal, if he had made the examination personally, would
have detected them.   The alleged duty, at most, only requires the depositor
to use ordinary care; and if this is exercised, whether by himself or his
agents, the bank cannot justly complain, although the forgeries are not dis-
covered until it is too late to retrieve its position, or make reclamation from
the forger.'   And the duty may be discharged although the depositor, upon a
personal examination of the returned checks, fails to discover a forgery of
his own signature.   Judge ANDREWS says: 'If he examines the vouchers
personally, and is himself deceived by the skillful character of the forgery,
his omission to discover it will not shift upon him the loss which, in the first
instance, is the loss of the bank.   *   *   *. If the bank pays forged checks,
it commits the first fault.   It cannot visit the consequences upon the inno-
cent depositor, who, after the fact, is also deceived by the simulated paper.'
This case dealt with the question of duty, and so with the question of
negligence, of a depositor in respect of checks which purported to be his, but
which, in fact, were forgeries.   The law presumes that a man knows his own
signature.   This knowledge may enable him to discover a false check which
has passed the scrutiny of the bank and escaped detection.   Every voucher
returned to him is a separate notice by the bank that it has honored his draft,
and reduced its indebtedness to him by that amount.   He has a record of all
checks drawn by him, by reference to which he can easily determine whether
the vouchers returned to him are genuine.   There is a reason, therefore, why
he should give 'some attention' to an account rendered by the bank.   Com-
mon fairness seems to require that he should be reasonably diligent in in-
forming the bank of any fraudulent use of his name by which the bank has
been deceived, so that it may take such measures as are available to retrieve
its loss.   But there is no presumption of law that a depositor knows the sig-
nature of his payee.   *Bank* v. *Morgan*, 117 U. S. 107, 6 Sup. Ct. Rep. 657.
The payee's indorsement is a transaction in which he has no interest.   It
concerns the bank alone, and the bank must bear the whole risk of determin-
ing whether the indorsement is genuine.   The case of *Welsh* v. *Bank*, 73 N.
Y. 424, strongly resembles the case in hand.   The plaintiff was a commission
merchant.   Swindels was his book-keeper.   Johnson was a merchant in the
interior, from whom the plaintiff received consignments of produce for sale
upon commission.   From time to time, during a period of two years, Swin-
dels presented to the plaintiff fictitious accounts of sales of Johnson's prop-
erty, on which he procured the plaintiff's checks to Johnson's order for the
amounts shown to be due by said accounts.   Then Swindels forged the in-
dorsement of Johnson, and put the checks in circulation.   They were paid
by the bank, and charged against the plaintiff, and returned to him as vouch-
ers with his pass-book, which was written up and balanced monthly.   It was
Swindel's duty to examine the bank account.   The plaintiff made no exam-

ination of it during the period covered by the checks. At the trial a verdict was directed for the plaintiff; the court refusing to allow the defendant to go to the jury upon the question of the plaintiff's negligence, or the question whether there was an account stated binding upon him. The ruling was affirmed by the court of appeals; ANDREWS, J., saying: 'The checks were received by the bank through the clearing-house, and, when presented to be paid by the defendant, they purported to be indorsed by the payee, but the indorsements were forgeries. The bank, before paying the checks, was bound to ascertain the genuineness of the payee's indorsement. * * * In this case the examination by the plaintiff of the pass-book and vouchers alone would not have disclosed the fraud. The debits in the bank-book, and the checks to Johnson corresponding with them, he would expect to find. If he had gone further, and compared the checks with Johnson's account on his books, the fraud would have been detected, and probably by this means only. If his own name had been forged, as in *Weisser* v. *Denison*, or if items were debited in his pass-book which he had no reason to expect to find there, an examination of the book and vouchers would be much more likely than in this case to lead to a discovery. The plaintiff had a right to assume that the bank, before paying the checks, would ascertain the genuineness of the indorsements.'

"Upon what principle can a bank be permitted to allege negligence against a depositor for failing to examine an indorsement which the bank has already, by paying the check, certified to be the true indorsement of the payee? Why should a depositor be charged with negligence for omitting to examine the indorsement of a payee whose signature he is neither bound nor presumed to know? I have no hesitation in finding that there is no duty resting upon him to make such an examination. But the learned counsel for the defendant insists that, if the plaintiffs had examined the backs of these checks, they would have discovered the indorsements of Bedell and Henry, and so been notified that they (Bedell and Henry) were receiving the proceeds of the checks from the defendant. That may be so. By so doing, the plaintiffs might have acquired the same knowledge that was possessed by the defendant. But was it a duty which they owed to the defendant to inquire whether any other parties, or what other parties, had indorsed the checks? Negligence, however gross, is but an omission of duty, (*Railroad Co.* v. *Munger*, 5 Denio, 267,) and if there is no duty there can be no negligence. To hold, as the learned counsel claims, that the plaintiffs are to be charged with knowledge of whatever they might have known if they had inspected all that was written upon the backs of these twenty-seven checks, would be, it seems to me, to exact from them a degree of diligence, and impose upon them a responsibility, not demanded or permitted by the authorities which have been cited. The plain doctrine of those authorities is that a bank, whose duty it is to carefully scrutinize a check or draft before it pays it, and to pay it only to the person to whose order it is· drawn, or upon the true indorsement of such person, and to take notice of anything which the paper discloses which suggests a doubt as to the title of the party demanding payment, or a suspicion as to the entire regularity of the transaction, should not be permitted to escape from the consequences of its inattention and neglect, and cast them upon the drawer, where no act of the drawer has misled the bank, or induced it to relax its vigilance. The case of *Vagliano* v. *Bank* (more fully referred to hereinafter) is directly in point. Upon the question of the plaintiff's alleged negligence, CHARLES, J., said: 'The most important argument presented by the attorney general in support of the view that the plaintiff had been guilty of negligence in or immediately connected with [the transactions] was that which he based on an alleged duty on the part of some one in Vagliano's office to scrutinize the paid bills as they were returned from time to time to the plaintiff. But, in the absence of anything to direct special attention

to them, it was not proved that it was any part of the duty of the clerk who checked them with his cash-book to examine the indorsements on the back of the bill at all.  It was immaterial, so far as his purpose was concerned, to whom the money was paid, or whether it was paid over the counter or not, or whether it had gone through the hands of one or or a dozen indorsees.  * * *  If they had been examined, it would have been discovered, not only that the bills bore no banker's stamp, and therefore had been paid across the counter, but also that the indorsements were not genuine; for it was proved that when the bills were accepted by the plaintiff there was nothing on the back of them; but when they were returned they bore indorsements earlier in date than the date when the bills were accepted.  * * *  The gross irregularity of these indorsements must, if they had been looked at, instantly have arrested attention, and have led to Glika's detection.'  But the defense of negligence was overruled.  ' I cannot hold [said the learned judge] it was a negligent act on the part of the plaintiff not to examine, or cause to be examined, these indorsements.'

"It is an uncontested fact that many of these checks were made payable to persons who had no existence; the names of the payees having been invented or fabricated by Bedell.  The defendant insists that under the statute, and also at common law irrespective of the statute, these checks were, in legal effect, payable to bearer, and that the bank was authorized to pay them without any indorsement, or with an indorsement that was forged.  The exact propositions submitted by the learned counsel are as follows: ' *First*. As to the checks which were in fact payable to fictitious payees, the plaintiffs, having, by their own voluntary acts, without inquiry as to the existence or non-existence of any such persons as are named as payees therein, made them payable to fictitious and non-existing persons, are estopped to question the indorsements.  *Second*. Under the statute, the several checks made payable to names of persons, and not to persons having any existence, were, in legal effect, payable to bearer.'  The early English cases cited by the learned counsel all relate to paper made or accepted with knowledge that the payees named were non-existent.  *Tatlock* v. *Harris*, 3 Term R. 174; *Vere* v. *Lewis*, Id. 182; *Minet* v. *Gibson*, Id. 481, affirmed in house of lords 1 H. Bl. 569; *Collis* v. *Emmett*, 1 H. Bl. 313.  The doctrine which they establish is stated by Lord LOUGHBOROUGH in *Collis* v. *Emmett* in these words: 'A bill of exchange is an authority to pay pursuant to the order of the payee, and it is also an undertaking to pay pursuant to that order; but if there be no person who, by any possibility, can give such an order, the engagement must be to pay the bill.  If the order of the person cannot be procured, and, with the knowledge and privity of the parties who made the bill, such a name is put in as cannot give an order, it is in effect, and in point of law, the same thing as if they had made it payable to the person who held the bill, namely, the bearer.'  The rule is stated by Chitty as follows: 'A bill payable to a fictitious person or his order is, in effect, a bill payable to bearer, and may be declared on as such in favor of a *bona fide* holder, ignorant of the fact, against all the parties knowing that the payee was a fictitious person.'  Chit. Bills, 178.  And by Byles: ' If the acceptor, at the time of acceptance, knew the payee to be a fictitious person, he shall not take advantage of his own fraud; but a *bona fide* holder may recover against him on the bill, and declare on it as payable to bearer.'  Byles, Bills, 61 marg.  Judge BRONSON criticised and dissented from the rule in *Coggill* v. *Bank*, 1 N. Y. 113.  He saw no reason why the liability of an acceptor of such a bill, which had been put into circulation by the drawer, should be made to depend upon the acceptor's knowledge that the payee was a fictitious person.  ' It is enough,' he said, ' that the holder has a good title to the bill, so that the acceptor, on paying it, can properly charge the amount against the funds of the drawer in his hands, if there be any, and, if there be none, that he may have an action against the drawer for money paid to his

use.' In the *Vagliano Case*, above mentioned, it was held on appeal (22 Q. B. Div. 243) that 'fictitious' meant 'fictitious to the knowledge of the party sought to be charged upon a bill;' and it was said by Lord Justice BOWEN: 'If the drawer is the person against whom the bill is to be treated as a bill payable to bearer, the term "fictitious" may be satisfied if it is fictitious as regards himself, or, in other words, fictitious to his knowledge.'

"The question has been recently discussed and decided by the supreme court of Ohio in *Armstrong* v. *Bank*, 46 Ohio St. 512, 22 N. E. Rep. 866. The plaintiff delivered her check, drawn on defendant, in exchange for a note which purported to have been made by William Brown, to whose order the check was payable. There was no such person. The whole transaction was a fraud on the plaintiff, perpetrated by one Grimes, who represented himself as acting for Brown, and who indorsed the check in Brown's name, and obtained the money from the defendant. It was held that the bank must bear the loss. The court said: 'The fact that the check was made payable to a person that had no existence does not alter the rights of the plaintiff as against the bank, for she supposed that Brown was a real person, and intended that payment should be made to such person. The doctrine that treats a check or bill made payable to a fictitious person as one payable to bearer, and so negotiable without indorsement, applies only where it is so drawn with the knowledge of the parties.' In other words, whether the payee of a check, who is non-existent in fact, is fictitious in judgment of law, must depend upon the intent of the drawer when he utters the check. If he believes himself to be dealing with a living person, to whom he has incurred or expects to incur a liability, or from whom he has received or expects to receive a consideration, and issues his check to the order of such person, and for delivery to him in discharge of such liability, or in settlement or exchange for such consideration, the payee is not fictitious, and the check is not payable to bearer.

"In *Turnbull* v. *Bowyer*, 40 N. Y. 456, the check was made payable to the order of Kierhmon & Holmes, which names were erroneously written for Richmond & Holman. The indorsement of the payees was forged by one Miaglia, to whom the check was delivered by the drawers. Upon the trial of the action, (which was against the subsequent indorser, and upon his implied warranty of the genuineness of the payees' indorsement,) evidence was admitted to show that Ball, Black & Co., the drawers of the check, intended to make the same payable to Richmond & Holman, and directed their clerk to so fill it out. The court held that such evidence was properly received, and said: 'The evidence had no materiality, so far as it went to explain the discrepancy in the spelling of these names, but it was material to show that it was not intended to make it payable to Miaglia, or to fictitious persons, so that Miaglia could use it without the indorsement of the payees. * * * That this evidence was competent is perfectly apparent, I think, to the appellant's counsel, for it furnishes a perfect answer to his fourth point made upon this appeal, which is that this check was payable to fictitious persons, and Miaglia could transfer it so as to give a good title without any indorsement.'

"The statute has not changed the rule of the common law, except to extend it so as to embrace paper payable to the order of the maker, and put in circulation by him without indorsement. *Plets* v. *Johnson*, 3 Hill, 115. It declares as follows: 'Such notes, made payable to the order of the maker thereof, or to the order of a fictitious person, shall, if negotiated by the maker, have the same effect, and be of the same validity, as against the maker and all persons having knowledge of the facts, as if payable to bearer.' But when is a note 'negotiated?' In *Bank* v. *Lang*, 1 Bosw. 206, the court said: 'We consider that a note is negotiated within the statute when it is delivered out by the maker for a consideration received or agreed to be received, or delivered for circulation, and when, had it been actually indorsed, it would have possessed the character of negotiability.' In that case the note was drawn to

the makers' order, and delivered by them, unindorsed, to a marine insurance company as a premium note upon an open policy.   This, it was held, was a 'negotiation,' within the meaning of the statute.   'A bill is properly said to be negotiated when it has passed into the hands of the payee or indorsee or other holder for value, who thereby acquires a title thereto.'   *Baring* v. *Lyman*, 1 Story, 416.   It was said in *Marvin* v. *McCullum*, 20 Johns. 289, that a note ' has no legal inception until it is delivered to some person as evidence of a subsisting debt.'   In *Kinne* v. *Ford*, 52 Barb. 197, one question raised was whether a check had been delivered.   ' Delivery [the court said] was the transfer of the possession of the check in question, with the intent to transfer the title by the plaintiffs to the agent of the defendants, and the acceptance by such agent of the check for his employer, with the intent to receive such title.   It is a thing in which both parties must join.   The minds of both parties must concur.'   And in *Wilcox* v. *Corwin*, 117 N. Y. 503, 23 N. E. Rep. 165, it was held that a promissory note, while in the hands of the maker, had no existence or value as such, nor was it available to any one.   ' It was not good to the maker, for it was his own promise; it was not good to the payee, for it was undelivered; and to make it good in the hands of any other person required both indorsement by the payee, and delivery.   *   *   *   When de- livered to the payee, the promise became effective; and it then, and not before, became a chose in action, valid and effective.'

"The facts attending the drawing of these checks are not in dispute.   Be- dell was the plaintiffs' clerk, having charge of the real-estate department of their business, and enjoying their unbounded confidence.   He examined the titles to real estate upon which moneys were loaned by the plaintiffs' clients. Each examination, or pretended examination, was reported by him to one of the plaintiffs' firm; his statement showing (among other things) existing liens and incumbrances, (if any,) the amounts required to remove them, and the names of the several parties in whose favor checks were to be drawn to complete the loan.   The defendant's counsel, with great fairness, states as follows:   ' The checks in question were all delivered by plaintiffs through Dodge [the cashier of the plaintiffs] to Bedell, and were, except as to a few of them which were supposed to be for the purpose of paying off liens, so de- livered to Bedell, to be by him paid out against the securities to be received for plaintiffs on behalf of their clients, the mortgagees.   These securities con- sisted chiefly of mortgages on real estate to secure bonds of the mortgagors. The checks were drawn by the plaintiffs, in every instance, to be deliverable only against the mortgages, and were made and issued to Bedell for that pur- pose.'   As matters of fact, (in respect of these particular checks,) no loans were made; there were no borrowers; no titles were examined; the bonds and mortgages representing the pretended loans were forgeries; the alleged mort- gagees were not in being; every transaction was a pure fraud and felony; and Bedell, having by these means obtained the plaintiffs' checks, forged the in- dorsements of the several payees, and appropriated the proceeds to his own use. Judged by the authorities which have been cited, these payees were not ficti- tious, and the checks were not payable to bearer.   They were made in the usual course of business, and to the order of payees whom the plaintiffs be- lieved to be existing persons, and from whom they expected to receive in ex- change the payees' personal obligations, with security.   It was to such per- sons only, or to their order, that the plaintiffs directed the defendant to pay the checks for their account.   Nor were these checks ' negotiated' by the plaintiffs.   The plaintiffs did not deliver them, nor put them into circulation. The claim that they negotiated them through Bedell, who was their agent, and by whose acts they are bound, seems to me to be without foundation.   A *bona fide* holder of commercial paper may enforce it against the maker, al- though such paper was fraudulently or feloniously put into circulation, with- out the maker's knowledge, and in defiance of his express instructions, (*Gould* v. *Segee*, 5 Duer, 260;) but the act of ' negotiation' which subjects the pa-

o

per to the operation of the statute, and determines its character as paper payable to the bearer, must be the act of the maker, either done or authorized by him.

"Another objection is urged against the plaintiffs' right to recover in this action, which does not seem to require any considerable attention. It is insisted that the plaintiffs are estopped by their own negligence, which consisted in placing too great confidence in Bedell, and in clothing him, for certain purposes, with all the power of the firm, and in not examining the bonds and mortgages for which they drew and delivered to Bedell these checks, or their register of titles, the entries in which would, if inspected, have disclosed the frauds. Like objections seem to have been raised in several of the cases to which reference has been made. SEDGWICK, J., said of the defense of plaintiff's negligence in Welsh v. Bank, 42 N. Y. Super. Ct. 469: 'The considerations pertinent to this defense relate to the fact that when the clerk presented the checks for signature, as being drawn for amounts due, the plaintiff believed the clerk, and did not look at the original entries to learn what the facts were; that is, he trusted his clerk. That trust was not negligence. Of course, handing the checks, after they were signed, to the clerk was not negligence, nor did that give the clerk any credit with the defendant.' In affirming that case, Judge ANDREWS said as follows: 'He [the plaintiff] was deceived into giving the checks by the fraud of Swindels; but this act did not affect the action of the bank, nor, in a legal sense, did it contribute to the fraud perpetrated upon the defendant. The frauds committed upon the plaintiff and upon the bank were independent and unconnected frauds; and the fact that the plaintiff intrusted the checks to his clerk to send to Johnson, who forged the indorsements, made him no more responsible than if he had intrusted them to an expressman to carry to Johnson, and the expressman had forged the name of the payee, and passed them to the defendant.' 73 N. Y. 429. The same answer was made to the charge of Weisser's negligence in 10 N. Y. 83: 'Whatever loss the bank has sustained it has suffered from its own negligence and want of skill in a matter as to which, in the first instance, it, and it only, was bound to exercise skill and diligence. To this loss no act of Weisser has contributed. He was guilty of no bad faith. He has violated no duty which he owed to the bank, and is in no way responsible.' And in Frank v. Bank, 84 N. Y. 214, the court said: 'The bank, in paying the successive checks, did not act upon the fact that a previous forged check had passed the plaintiffs' scrutiny unchallenged. In each case the bank paid the check presented because upon inspection it supposed it to be genuine. If the forged checks first returned had been immediately ascertained to be forgeries, it might, and probably would, have prevented the subsequent forgeries. But the failure to detect them was not the reason of the subsequent payments by the bank.' The case of Vagliano v. Bank involved frauds to the extent of £71,500, committed by one Glika, a clerk in the plaintiff's service. By fraudulent practices, Glika procured the plaintiff's acceptances of bills which he had forged, which purported to have been drawn by a foreign correspondent of the plaintiff's and which were payable to the order of another foreign firm. He then forged the indorsements of the payees, and received payment of the bills in cash from the defendant. The forged bills were forty-three in number, and were paid at different dates, as they respectively fell due, between February 18 and October 12, 1887. One ground of the bank's defense was negligence on the part of Vagliano. The case was tried before Justice CHARLES without a jury, and the defense was disallowed. The judge said: 'It is alleged that the plaintiff has by his conduct disentitled himself from insisting on treating these payments as made without authority; that he has been guilty of such negligence as excuses the defendants,—that is to say, of such negligence which is the proximate cause of the loss.' This the learned judge denied, following Bank of Ireland v. Evans' Charities, 5 H. L. Cas. 389, and Mayor, etc., v. Bank of England, 21 Q. B. Div. 160.

'Mere negligence, [he said,] or a careless and slovenly mode of conducting business, would certainly not be enough.   The negligence must be in, or immediately connected with, the transaction itself.   * * *   It was urged that there was a total absence of effective supervision over Glika's proceedings, and that this of itself constituted such negligence as precluded the plaintiff from recovering.   And I agree with the attorney general that there was a want of proper superintendence over the foreign correspondence in the plaintiff's office.   Glika, a clerk at a very small—indeed, almost an insignificant—salary, having regard to the important duties intrusted to him, was left without a check of any kind for months together.   * * *   The want of supervision, however, though in my opinion it was careless, was not in itself the proximate cause of the loss, and, according to authorities to which I have referred, was not enough to disentitle the plaintiff from complaining of the payment of the forged bill.'   On appeal the decision was affirmed.   22 Q. B. Div. 243.   'On the question of negligence [said Lord Justice BOWEN] we agree with CHARLES, J.   There was no evidence of negligence on the part of the plaintiff which directly caused the frauds in question in this action so as to prevent the plaintiff from succeeding in his claim. There was, we think, negligence on his part in leaving so much to a clerk in Glika's position without any effective supervision or control over his proceedings.   But this was not the proximate cause of the loss which had been incurred, and therefore cannot be relied upon as a defense against the claim of the plaintiff, even if there was no negligence on the part of the bank.'   It is not necessary to pursue this objection further.   It is fully met and refuted by the authorities mentioned, and others cited by the plaintiffs' counsel. *People* v. *Bank of North America*, 75 N. Y. 547; *Atlantic Cotton Mills* v. *Indian Orchard Mills*, (Mass.) 17 N. E. Rep. 496; *Swan* v. *Australasian Co.*, 2 Hurl. & C. 175; *Crawford* v. *Bank*, 100 N. Y. 55, 2 N. E. Rep. 881.

"The last defense set up in the defendant's answer relates to the ten checks which were drawn payable to the order of real borrowers on bonds and mortgages.   It is alleged that if these checks 'were not actually indorsed by the several payees named therein, the names of the said payees were respectively indorsed upon the said several checks by the said James E. Bedell, and that the proceeds of the said checks were received by the said Bedell, and, to the extent to which the said proceeds were used by the said Bedell, the several sums used by him were afterwards made good by him to the several payees named in said checks, or were applied by him for the benefit of said several payees; so that, in respect of all and every one of said last-mentioned checks, * * * the said plaintiffs sustained no loss or damage by reason of any act of said James E. Bedell, or of the defendant, as to said checks, or any of them.' Therefore, the defendant says, for the amount of those checks, at least, there can be no recovery in this action.   The apparent fairness and justice of this claim disappears when the relations between these parties, plaintiffs and defendant, and the nature of this action, are considered.   If this were an action to recover damages for the wrongful disbursement by defendant of the plaintiffs' moneys, such a defense would be entitled to favorable treatment. But this is not such an action.   The plaintiffs are seeking to recover an indebtedness due to them from the defendant, arising out of deposits of money made by plaintiffs with the defendant upon the defendant's agreement to restore the same when called for.   Against the indebtedness so created, the plaintiffs drew certain checks, which defendant paid, but in disregard of the plaintiffs' directions, and to parties having no right or title thereto.   Such payments were not made on the plaintiffs' account, and did not reduce the defendant's indebtedness to them.   The question is, can the defendant be permitted to avoid its agreement with the plaintiffs, and its contract liability to them, by showing that certain parties, who had claims against the plaintiffs for the moneys represented by these checks, and in whose favor the checks were drawn, have since been paid the amounts of their claims by another

party, whereby the plaintiffs' liability to them has been discharged? I am unable to see how such a transaction at all affects the relation between the plaintiffs and the defendant, or how it operates as a payment of the defendant's debt, even though the said claims were paid by the party who, by fraud and forgery, deceived the defendant into payment of the checks. My conclusion is that the plaintiffs are entitled to judgment for the full amount claimed in their complaint."

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Wm. Allen Butler,* for appellant. *Elihu Root,* for respondents.

BRADY, J. The issue presented in this case was whether the defendant had paid the plaintiffs' checks specified and exhibited herein, the indorsements upon which were forgeries, under circumstances which relieved it, notwithstanding the forgeries, from responsibility. The necessity for each check, and its amount, was declared by the plaintiffs' clerk, who was connected with a bureau of their business known as the "Real-Estate Department," organized for loans, on bond and mortgage, of the moneys of clients, and who was duly authorized thereto in the discharge of his duties as to the loans to be made on proper securities, subject, however, to the supervision and approval of one of the plaintiffs. Upon the trial it appeared that this employe had forged all the indorsements of the payees, and appropriated the moneys received; that some of the payees were fictitious; and that some of the moneys received were used to discharge obligations growing out of transactions in the department mentioned, but undoubtedly in furtherance of the felonious scheme conceived and carried out by the employe. The defendant insisted that it was not liable for any of the checks drawn to the order of fictitious persons, and claimed a deduction, at all events, for the amount of money used to pay obligations as suggested, from any sum for which it might be held liable. It also appeared that the plaintiffs' bank-book was frequently balanced, and returned to them with the vouchers, and that these vouchers embraced those upon which the indorsements had been falsely made; and the defendant contended, and from different points of view, including the asserted duty of the plaintiffs to examine the indorsements upon the vouchers, that the legal effect of this was to discharge it from all liability. The propositions springing from these various features were carefully and fully examined by the learned referee conducting the trial, who has presented his views in an able opinion, which on principle and authority sustains the correctness of his conclusions of law with regard to each, all of which were adverse to the defendant. The consideration given to them is so abundant and convincing that it would be work of supererogation to repeat them, however different in terms, and the ceremony will not therefore be indulged. The very earnest and comprehensive argument of the learned counsel for the appellant has not convinced us that the referee erred, while the learned counsel for the respondents has fortified the referee's conclusions by additional citations and reasons. It is not at all necessary to consider with particularity any of the exceptions taken during the trial. It is sufficient to say of them generally that they do not demand or require any interference with the judgment appealed from. Indeed, the whole controversy depends upon propositions springing from facts which are not in dispute, and which were fully considered and disposed by the referee. The judgment should, for these reasons, be affirmed, with costs.

VAN BRUNT, P. J., concurs.

DANIELS, J., (*concurring.*) I concur in the result. The opinion of the referee fully meets and answers all the objections substantially relied upon to resist the recovery. The plaintiffs' rights were fairly maintained, and there should be an affirmance.