## Commonwealth *v.* Benjamin F. Junkin and William A. Sponsler.

*Criminal law—Banks and bankers—Receipt of deposit when insolvent—. Act of May 9, 1889.*

On the trial of an indictment for a violation of the act of May 9, 1889, P. L. 145, entitled " An act relating to the receiving of deposits by insolvent bankers," etc., in order to secure a conviction, the commonwealth must prove beyond a reasonable doubt, (1) actual insolvency at the time the money is received; (2) defendant's knowledge of the insolvency; (3) the receipt of the money as a bank deposit.

Where a banker or an officer of a bank receives money over the counter at a time when he knows the bank to be insolvent, but keeps the money separate from all other funds, with the intention of returning it, and actually does return it, he cannot be convicted of a criminal receipt of money as a bank deposit within the meaning of the act of May 9, 1889.

On the trial of an indictment for a violation of the act of May 9, 1889, the evidence on behalf of the defense tended to show that the two defendants were partners in a private bank; that at the time of the insolvency of the bank both partners were ill; that the business was largely under control of the cashier; that, when the defendants learned of the insolvency, they instructed the cashier not to receive any deposits, or if he did, to keep them separate, mark them specially, and return them to the depositor. Towards the end of the banking hours the clerk received a small deposit which he neglected to keep separate, but on the following day the amount of the deposit was returned to the depositor.  *Held,* that it was error to charge the jury: " We do not think the question as to whether the money deposited was to be returned, or the fact that it was afterwards returned, is material to the case."

A principal is not answerable criminally for the wrongful act of his agent, when the act is in positive disobedience of the principal's instructions.

Penal statutes which inflict punishment must be strictly construed.

Argued May 28, 1895.   Appeal, No. 411, Jan. T., 1895, by defendants, from judgment of Q. S. Perry Co., on verdict of guilty.   Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ.   Reversed.

Indictment for embezzlement under the act of May 9, 1889, P. L. 145.   Before BELL, P. J., of the 24th judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court.

Defendants' point, among others, was as follows:

" 16. If the jury believe from the evidence that Willis was ordered not to take deposits on the 24th of March, 1894, the day the money of Rice was taken, and if the money was taken that it must be returned and it was returned, the verdict must be not guilty.   *Answer:* This point is denied.   We do not think the question as to whether the money deposited was to be returned, or the fact that it was afterwards returned, is material to the case."  [8]

Verdict of guilty as indicted.   The court sentenced defendants to pay a joint fine of twenty dollars, and each defendant to one year's imprisonment in the penitentiary.

*Error assigned,* among others, was (8) above instruction, quoting it.

C. H. Bergner and J. C. Bucher, Louis E. Atkinson and Charles A. Barnett with them, for appellants.—We know of but three cases in which a construction has been placed upon the act of May 9, 1889, P. L. 145.   In each of these cases the court in its charge to the jury said there could be no conviction unless the jury was satisfied by the testimony that the defendants had received money as a deposit from the depositor: Com. v. Delamater, 2 Dist. Rep. 118 ; Com. v. Schall, 12 Pa. C. C. 209 ; Com. v. Rockafellow, 163 Pa. 139.

We think the following propositions are established : (1) That the enacting clause or body of this act is unconstitutional and incapable of enforcement; (2) the title must be read into the

act, so that its constitutionality can be saved, thus making the offense " the receiving of money as a deposit," etc ; (3) the title restricts the enacting clause or body of this act to the object stated in the title.

A deposit of money in a bank is where the depositor parts with the title to his money and loans it to the bank, and the bank in consideration of the loan and the right to use the money for its own profit, agrees to refund the same amount, or any part thereof, on demand: 2 Am. & Eng. Ency. of Law, 93 ; Foley v. Hill, 2 H. & L. Cas. 28 ; Morse on Banks and Banking, 25.

Whether the money was taken and received as a deposit or not is a matter of proof.   And as the commonwealth, by its own witnesses, has shown that the money was not taken and received as a deposit, we respectfully insist that the court below should have ordered the defendants to be acquitted or should have arrested the judgment.

*Luke Baker*, district attorney, and *Albert Millar*, *George Kunkel* and *W. H. Woods* with them, for appellee.—If this were a civil proceeding, the defendants having received the money in the usual course of business, without any notice to Rice that they did not intend to receive it as a deposit, they would be estopped from setting up the defense that their receipt of the money was not a receipt as a deposit: Wharton's Law of Contracts, secs. 6, and 707.

The commonwealth earnestly contends that the interpretation of the act by introducing into it the phrase " as a deposit " so that the receipt of money must be such as will create a contractual relation between the person giving and the person receiving, is false and absurd.   This interpretation of the appellants would amount to a nullification of the act: Endlich on the Interpretation of Statutes, 453.

As against the interpretation contended for by the appellants, the commonwealth respectfully suggests that the offense defined by the act having regard to its title is that of receiving a deposit of money by an insolvent banker with knowledge of his insolvency.   The word " deposits " used in the title is synonymous with the phrase " money from a depositor " used in the body of the act.   The word " deposits " must be given its pop-

ular meaning: Endlich on Interpretation of Statutes, 101; Com. v. Rockafellow, 163 Pa. 139.

OPINION BY MR. JUSTICE DEAN, July 18, 1895:

In September, 1866, the defendants entered into copartnership in the banking business at Bloomfield, Perry county, with three others, under the name of "Perry County Bank," capital, $30,000. In the year 1876, by death and retirement the number of partners was so reduced as to leave but these two defendants, who continued the business down to March 24, 1894, when the bank closed its doors because of undisputed insolvency. The defendants, from the time the bank opened until it closed, were lawyers, actively engaged in the practice of their profession in Perry and adjoining counties, so that the personal attention they gave the bank's affairs during that period was only such as men in their situation could give; while often in the bank, they were not there in daily supervision, exercising that watchfulness the nature of the business demanded. Sponsler, it is true, was president, and inspected and passed upon much of the paper discounted, but he did not watch the daily balances of customers, and guard the resources of the bank from depletion by bad banking. This was intrusted to the cashier. When it was organized, William Willis was chosen cashier and he remained in this position until his death in 1891, when his son James, who had been an assistant to his father for some years before the latter's death, was chosen to his place; he then continued as cashier until the bank closed. Most of the important details of the management were intrusted to the father and son, while cashiers; in the interval of two or three weeks between the death of the father and the selection of the son, Sponsler, one of defendants, acted as cashier. Whether defendants realized the fact is not clear, but the evidence now makes it clear that, at this time when James Willis succeeded to the cashiership, the bank, practically, was insolvent, because a large part, if not all, of its original capital had been sunk, and no new capital had been contributed. The bank, under the new cashier, as is usual with lame institutions of that character, went limping along in hopes of bettering its condition, which however continued to grow worse until the end on Saturday, the 24th of March, 1894. Some days before its close,

Junkin, without doubt, and Sponsler, probably, knew the bank was very seriously embarrassed for money; their expectation of relief from this condition is not material; their knowledge of the fact is. On Saturday, the 24th, about a quarter to three o'clock, and just before the bank finally closed, Josiah Rice handed over the counter, as a deposit, $20.00. The money was received by Harry E. Bonsall, a clerk, acting under Willis, the cashier, and although afterwards returned to Rice, nevertheless, at the time, the money was mingled with the general funds of the bank. After the bank closed Rice instituted this criminal prosecution against Junkin and Sponsler, bankers, under the act of May 9, 1889, for receiving a deposit, knowing at the time the bank was insolvent. Being convicted, and sentenced to fine and imprisonment, we have before us this appeal.

Appellants prefer sixteen assignments of error to the charge of the court, and answers to points. With the exception of the eighth, it would be a waste of time to discuss and pass judgment on these multiplied complaints of error; while the gravity of the consequences of this judgment to their clients doubtless impelled counsel to press them upon our consideration, they are so destitute of merit, that an elaborate review is not called for by any duty on our part to the commonwealth or the defendants. The case was most carefully and ably tried; the learned judge of the court below, in all his rulings, displayed unassailable impartiality, and certainly, defendants, unless as to the assignment noted, have no ground whatever of complaint. All assignments, except the eighth, are therefore formally overruled.

The eighth involves an interpretation of the act of 1889. That act being very short, we quote it in full, thus:

" Section 1: Be it enacted, &c., That any banker, broker, or officer of any trust or savings institution, national, state or private bank, who shall take and receive money, from a depositor, with the knowledge that he, they or the bank, is at the time insolvent, shall be guilty of embezzlement, and shall be punished by a fine in double the amount so received, and imprisoned from one to three years in the penitentiary."

The title of the act is: " An Act Relating to the Receiving of Deposits by Insolvent Bankers, &c.," and the title is part of the act to be resorted to in interpreting it.

There are three essential elements, which the commonwealth must prove beyond a reasonable doubt, before the jury can find the guilt which the act makes punishable: 1. Actual insolvency at the time the money is received. 2. Knowledge of the insolvency. 3. The receipt of the money as a bank deposit.

As to the first two elements, there was much evidence tending to establish the fact of insolvency on and long prior to March 23, 1894, and knowledge of such insolvency by both Junkin and Sponsler; and the verdict of the jury on competent evidence under proper instructions, has established both in favor of the commonwealth.

But, did the defendants, as bankers, in the face of the prohibition of the statute, receive Rice's money, as a bank deposit, on the 24th? The essential element of crime, unless otherwise declared by statute, is the intent to commit it, or the willfulness of it. The legislature can declare an act a crime, and make it punishable, regardless of the intent, but this statute will not bear such interpretation; its aim is, to punish dishonesty; the moral guilt which prompts to falsehood and deception; for there is necessarily moral guilt on the part of a banker, who, with knowledge of insolvency, receives as a bank deposit the money of a customer; by necessary implication, when he so receives it, he says to the depositor, " My bank is solvent, and is able to repay this amount when called for; " if such were not the implied representation, relied on, too, by the depositor, he would not leave his money. To constitute the criminal intent, it is not, however, necessary that the banker at the time intended to defraud the depositor; his intention to repay may have existed; it is the concealment of his present, to him known, inability to pay, and in that condition, receiving, as part of the funds of the bank, the depositor's money, which he knows, without the false representation, he would not receive, that constitutes the criminal intent.

Was Rice's money received as a deposit of the bank?

The defendants, in their sixteenth point, the answer to which is the subject of the eighth assignment of error, requested the court to instruct the jury: " That if they believed from the evidence, that Willis was ordered not to take deposits on the 24th of March, 1895, the day the money of Rice was taken, and if money was taken, that it must be returned, and it was returned, the verdict must be, not guilty."

To this, the court made answer: "This point is denied. We do not think the question as to whether the money deposited was to be returned, or the fact that it was afterwards returned, is material to the case."

Is this rigid interpretation of the act warranted? It must be borne in mind that there was evidence to which the jury were to apply it in making up their verdict. The defendant had called to the stand B. F. Junkin, who had been ill and confined to his room from the 1st of February previous to the 24th of March, the day the bank closed; he stated, he first learned of its alarming condition on the evening of the 23d of March; on the morning of the 24th he sent a messenger for Willis, the cashier, to come to his house; he came, and he said to him, "Jim, you must not open that bank this day, absolutely you must not do it;" he says, "I will open it, I must open it;" "No," I said, "Jim, it is closed now, and you can leave it closed, and leave it stand just as it is, this thing must stop." He says, "I can't close the bank in the daytime." "Why not," I said. "Well, I can't and won't close it in the daytime." I said "Jim, if you won't close as I order you to do, and you open its doors, you must not take one deposit this day, not over its counter or anywhere else." He says, "I can't open the bank, and not take deposits, that would not be banking." And I says, "I don't want banking to go on, I want it stopped." He says, "I will open the bank and take deposits just as I have taken deposits." I said, "Jim, if you do that, you do it at your peril, and I warn you not to do it;" and I said, "If you persist in doing this, if you persist in opening the bank against my order, and taking deposits against my order, then take care of yourself; and if you receive deposits, then make special deposits of them, put each up by itself, and put it by itself, and return it to the depositors," and that he said he would do.

This statement is corroborated by Mrs. Junkin, and is partially admitted by Willis, the cashier, the principal witness for the commonwealth.

Willis opened the bank, as he declared he would; all the deposits except two or three taken in that day were marked special, and the money and checks put in special envelopes, and afterwards returned; they never entered into or formed part of the funds of the bank. Rice's deposit, as noticed, was taken

over the counter by Bonsall, and as defendants alleged, inadvertently mingled with the bank's funds, but they afterwards returned to him a like amount, twenty dollars.

Putting aside for the present the question raised as to Junkin's answerability criminally for the acts of his agent; assume that he had himself been in the bank that day, and personally received this twenty dollars at the counter, and had put it in an envelope, marked with Rice's name, to be returned to him, in case the bank closed, and then did return to him the same twenty dollars; would that, within the meaning of the act, have been the receipt by a banker, knowing the bank to be insolvent, of money on deposit? The peril to and loss of the depositor's money arises from the concealed insolvency of the bank; but if it never mingles with or forms part of the bank's funds, which are assets for the payment of creditors generally; remains separate from all other funds, and is capable of absolute identification, so that it may be returned, and is actually returned, that does not constitute the criminal receipt of money as a bank deposit. The real deposit, whether on time or call, when passed over the counter, is thereafter the property of the bank absolutely; it is the intention of the depositor and the bank, that the latter shall thereafter use it as its own by loaning it to others, and paying it out on checks drawn by others; the express or implied promise of the bank is, that it will repay him, not that money, but that amount of money; in the case we are supposing, the intention of the banker is, to hand back the identical money received, and that intention is manifested, not by what he says, but by what he does, not only at the time, but afterwards. This method of not receiving money on deposit by a banker knowing his insolvency, as demonstrated by the event here, is not an open, unequivocal observance of the law: he subjects himself to the peril of misconstruction of his real intention, and invites criminal accusation. But, unwise as may be the conduct, if no intention in fact existed to appropriate in aid of his insolvent bank the depositor's money, and he did not, in fact, so appropriate it, he is not a criminal. If such a transaction is not a deposit by a depositor, if there be no contract to which the minds of both parties assented, then, it is not within the terms of the act. Penal statutes which inflict punishment must be strictly construed.

If Junkin himself would not have been guilty, had he, under such circumstances, personally received the money, he would not be answerable criminally if he instructed his agent to so receive it. Whatever may be the answerability of the principal for the wrongful act of his agent in civil actions, he is not answerable criminally, when the act is in positive disobedience of his explicit instructions. Willis was the agent in control. Bonsall was his subordinate; whether the neglect to specially mark Rice's deposit was willful or inadvertent on their part, the act cannot be imputed to Junkin, whose orders were directly to the contrary; and if he is believed in his statement that he had been confined to his room by illness for months before and months afterwards, he cannot even be accused of neglect to personally attend in the bank on that day to see that his orders were executed.

As to the other defendant, William A. Sponsler, there is testimony that, for a year before the bank closed, he had been so ill as to be confined most of the time to his bed; on the day it closed, he was in a very dangerous condition, and wholly unable to even converse on business affairs; because of his disability, about a week before the bank closed, he had given his son power of attorney to take his place in the management; the son testifies, that he came to Bloomfield from Newport, on Saturday, the 24th, and about eleven o'clock in the forenoon went into the bank and gave Willis this instruction: " James, I tell you what I want you to do, all the money that you take in to-day, I want you to keep separate, each parcel by itself, and not to receive it as a deposit, keep it by itself, and on Monday return it to each of the respective parties, who deposited or left the money with you. He said, I will do so. And he said, that is what Judge Junkin told me I should do this morning, and that is what I am doing."

As Rice's deposit was made at a quarter to three o'clock, in the afternoon, when, as alleged, according to both defendants' instructions, that, or no other money was to be received as a bank deposit, it follows, Sponsler's situation is the same as Junkin's.

Much of the testimony as to the instructions given Willis was contradictory in its character, but in passing on this assignment of error we must assume the defendants' averments to be

the fact, because their sixteenth prayer for instruction only asked the court to say to the jury: If they believed from the evidence Willis received such orders, then defendants were not guilty. The court's answer was, in effect, that it was immaterial what they believed from this evidence. This instruction may have operated to the conviction of defendants. We think the learned judge of the court below mistakenly gave too rigid an interpretation to the act of 1889 in favor of the commonwealth; under that interpretation, the negligent, incompetent and unfortunate banker can be convicted of a serious crime, as well as the swindling and dishonest one; this was not the object of the act. If the legislature intend such result, it must be accomplished by a law leaving no reasonable doubt of such intention.

The judgment is reversed, and a v. f. d. n. awarded.