# CASES

IN THE

# SUPERIOR COURT

OF

# PENNSYLVANIA.

## Commonwealth v. E. K. Smith, Appellant.

*Criminal law—Banks and banking—Receipt of deposits when insolvent.*
The three essential elements which the commonwealth must prove beyond a reasonable doubt before the jury can find a defendant banker guilty of receiving deposits when insolvent are: 1. Actual insolvency at the time the money was received; 2. Knowledge of insolvency; 3. Receipt of money as a bank deposit. Sufficient proof of these essentials warrants the submission of the question of the defendant's guilt to the jury.

*Grand jury—Special or adjourned session—Power of court to call.*
Under the Act of March 18, 1875, P. L. 28, the Quarter Sessions has authority to make an order requiring the grand jury for the August term to meet prior to the first day of that term; and the fact that the meeting of the grand jury was coincident with a special or adjourned session did not invalidate the order nor convert such special or adjourned session into a regular term; the omission to publish the order in two newspapers thirty days prior to the meeting of the grand jury was not, standing alone, legal ground for quashing an indictment found by the grand jury at such meeting; and even if such publication was necessary to give validity to the acts of the grand jury, it is to be presumed on appeal, in the absence of affirmative record evidence to the contrary, that the order was duly published, upon the principle, omnia præsumuntur rite esse acta.

*Evidence—Embezzlement—Assignee's inventory as evidence of insolvency.*
The inventory of the assignee of an insolvent banker made within thirty days of the date of the assignment which was made one week after the deposit is admissible in evidence on the trial of the assignor, a banker, who had been indicted for receiving money on deposit as a banker, when insolvent, knowing himself to be so.

Such inventory is not conclusive, but it is a necessary step in the pro-

ceedings and tends to show the assets in the hands of the assignee for the payment of debts.

*Evidence—Limitations on re-examination of witness—Discretion of court.*

The extent to which a party will be permitted to re-examine his own witnesses is a matter largely within the discretion of the trial judge. While the see-sawing method of examination. is not to be approved of, in the absence of gross irregularity, or.abuse of discretion by the trial judge, the appellate court will not review.

*Evidence—Value of land adjoining—Time of comparison.*

Where the point in question is the value of land in 1893, evidence was properly rejected as to the sales of adjoining lands between 1880 and 1890, it was too remote in time to furnish a standard by which to measure the value of the land sold in 1893.

Argued Nov. 10, 1896. Appeal, No. 89, Nov. T., 1896, by defendant, from judgment and sentence of Q. S., Lancaster County, June Sess., 1895, No. 20, on verdict of guilty. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, ORLADY and SMITH, JJ. Affirmed.

Indictment against Edward K. Smith and Christian E. Graybill, bankers, for receiving deposits when insolvent, knowing themselves to be insolvent.

The complaint was made against defendants for embezzlement under the Act of May 9, 1889, P. L. 145. Graybill became a witness for the commonwealth and Smith was convicted and sentenced to imprisonment for one year and three months, to commence at the close of sentence in No. 30, June sessions, 1895, and pay a fine of $120, being double the amount received from John W. Paules, pay the costs of prosecution, and stand committed until the sentence be complied with.

In the case No. 30, June sessions, 1895, a similar indictment was found on the complaint of Francis A. Reichard wherein Graybill became a witness for the commonwealth, and Smith was convicted and a motion for a new trial was overruled, and defendant sentenced to one year and three months, to pay a fine of $120, being double the amount received from F. A. Reichard, pay costs of prosecution, and stand committed until the sentence be complied with.

The regular court of quarter sessions of Lancaster county began April 15, 1895, and during that week E. K. Smith was called for trial before Judge BRUBAKER. A motion was made

to quash the array of jurors because the jury commissioners had not been properly sworn. The judge thought the point well taken and refused to proceed with the trial. On Saturday of that week he ordered the grand jurors to return on the following Monday, and they did so return and found true bills against E. K. Smith and C. E. Graybill on that day, April 22, 1895. On April 24, 1895, the court made an order for venire for twenty-four grand jurors to be drawn for the adjourned sessions of June 10, 1895, and the jurors were drawn; the court rescinded that order, and on April 27, 1895, made another order for a venire for the drawing of twenty-four grand jurors for the regular August sessions, 1895; the third Monday of August, the 19th day, and further ordered that the grand jurors so drawn should attend the adjourned sessions to be held June 10, 1895; the grand jurors did so attend on June 10, 1895, and found the indictment upon which the defendant in this case was convicted.

On November 27, 1894, it was ordered by the court that the terms of the court of quarter sessions of the peace shall be and remain for the year 1895 as fixed by rules of court in new book of printed rules of court, lately adopted, and now in force on page 61. And it was also ordered that adjourned courts of quarter sessions for the trial of causes by jury shall be held during the year 1895, as follows: (inter alia).

" One week, commencing Monday, June 10, 1895."

Other facts are set out in the opinion of the Superior Court.

Verdict of guilty and sentence thereon. Defendant appealed.

*Errors assigned* were (1) overruling defendant's motion to quash the indictment; (2) in overruling defendant's point—Point: The court is respectfully requested to charge the jury that under the law and the evidence in this case there can be no conviction on this indictment, and the verdict must be, not guilty.

Answer taken from the general charge: " We say to you, whether the defendant is guilty or not guilty will be for the jury to say from all the evidence they have heard in the case, under the law as I shall now read to you;" (3–5) in overruling defendant's questions in the cross-examination of Graybill, a witness for the commonwealth, which questions were as follows:

(3.) "Q. And did you and Mr. Smith, both of you believe that the assets of the bank and the property of E. K. Smith, individually were sufficient to pay the liabilities of the bank?

(4.) "Q. Did you yourself believe at all times that the assets of the bank of E. K. Smith & Company and the individual property of E. K. Smith were sufficient to make all the liabilities of the firm of E. K. Smith & Company secure?

(5.) "Q. What property did you understand Mr. Smith owned?"

(6.) In admitting the following offer on the part of the commonwealth:

By Mr. Brown: I offer in evidence, as produced by the deputy prothonotary, the records from the court of common pleas of Lancaster county, the inventory in the assigned estate of E. K. Smith and wife, filed September 14, 1893, by the assignee, Michael S. Shuman, and also in the assigned estate of E. K. Smith & Company, filed on the same day. (7) In admitting the following question to George R. Boak a witness for the commonwealth:

By the Court: What, in your judgment, would that land have sold for in August, 1893, you are well acquainted there? (8–12, 14) Overruling defendant's questions in cross-examination to George R. Boak, a witness for the commonwealth, concerning prices received for adjoining land sold to the L. V. R. R. Co. and their value as compared with that of defendant's land; (13) error in putting the following question to George R. Boak a witness for the commonwealth: "Q. What, in your judgment, would they have sold for?" (15) In admitting the following question by the commonwealth to its witness, George R. Boak: "Q. If you were to give $10,000 for it do you mean you would become the owner of the land? A. Yes, sir." (16) In admitting the following question: "Q. To do with it as you please? A. Yes, sir." (17) In admitting the following question: "Q. And you wouldn't give more than that for it? A. No, sir."

*H. M. North* and *M. Brosius*, with them *B. Frank Eshleman*, for appellant.—Only two questions arise in this case, the first one is as to the sufficiency of the proof of insolvency of the defendant, and the other is as to whether a grand jury drawn

for the regular August sessions, to be held on the third Monday of August, 1895, could properly be convened at a court of quarter sessions held on the 10th of June, 1895, and find indictments, said court having been fixed by the order of the court on November 27, 1894, as one of the courts for the year 1895.

As to the first question the inventory filed by the assignee of the defendant was introduced and admitted against the objection of the plaintiff.

As to the second question, if it was proper to convene the grand jury drawn for the regular August sessions at a sessions on June 10, 1895, fixed by the court on November 27, 1894, then we have a new practice and one we did not know we had the power to establish under the act of April 18, 1875, and twenty-one years have elapsed since its passage.

*George Nauman* with him *W. M. Franklin, George A. Lane* district attorney, *Brown & Hensel, T. B. Holohan, C. C. Kauffman,* and *B. F. Davis,* for the commonwealth.

OPINION BY RICE, P. J., February 16, 1897:

The defendant was jointly indicted with C. E. Graybill under the Act of May 9, 1889 (P. L. 145), which provides as follows : " Any banker, broker or officer of any trust or savings institution, national, state or private bank, who shall take and receive money from a depositor with the knowledge that he, they or the bank is at the time insolvent, shall be guilty of embezzlement, and shall be punished by a fine in double the amount so received, and imprisoned from one to three years in the penitentiary." The defendant was tried separately. It appears that he and Graybill as partners conducted a banking business in the borough of Columbia from the year 1873 until the bank closed its doors on August 11, 1893. On August 17, 1893, E. K. Smith, and the banking firm of E. K. Smith & Co. made assignments for the benefit of creditors ; but immediately before making these assignments the defendant confessed judgments to divers persons, amounting in the aggregate to about $70,000. The inventories are not printed, but it is stated in the paper-book of the commonwealth, and the correctness of the statement is not challenged, that the assets of the firm were inventoried at $5,850.25, and of the defendant individually, at $46,490.50.

The balance sheet or statement made up from the books just before the receipt of the deposit in question, which was the day before the bank closed its doors, showed cash on hand $505.02, and other assets amounting, nominally, to about $189,000 , and liabilities amounting to $129,182.39; but there was ample evidence given on the trial that a very large proportion of these nominal assets was worthless, and that only a comparatively insignificant portion was available to pay depositors. Without undertaking to be exact as to figures, the evidence was overwhelming, and was practically undisputed, that the banking house was hopelessly insolvent, and had been so for months, if not years. The testimony of Graybill irresistibly leads to this conclusion, and he was fully corroborated by the books of the bank and other evidence. It was also shown that the defendant was fully cognizant of the bank's affairs and its insolvent condition.

But it appears that the defendant owned, individually, an undivided three fourths interest in a tract of land in Centre county, and the court charged the jury that the property of the individual members of the firm was liable for the firm debts, and that in the determination of the question of solvency the value of such property should be taken into consideration. This was a construction of the statute, of which the defendant, certainly, can have no just cause to complain, and does not complain. He does complain, however, of the rulings of the court in the admission and rejection of evidence relative to the value of the Centre county lands.

First, as to the admission of the inventory and appraisement filed by the assignee. The inventory was filed on September 14, 1893, within about a month after the bank was closed. The Centre county lands were appraised at $15,000, and there was no evidence that, at the time of the receipt of the deposit, they were worth any more. At the time of the trial they were unsold for want of bidders. In an action to rescind a sale of goods it appeared that the purchaser made an assignment for the benefit of creditors two months after the sale. The question was whether the purchaser was insolvent and had knowledge of it, and made representations to the seller as to his solvency which induced the sale. It was contended that there was no sufficient evidence of the purchaser's knowledge, but the Supreme Court said, " The purchaser's assignment for the

benefit of creditors, the inventory of his assets and the disparity between them and his liabilities, the absence of any claim of losses or change in financial condition between the sale and the assignment, were matters from which the jury might reasonably infer that he was insolvent, and knew, or ought to have known, that he was so, when he made the purchase: " Cooperage Co. v. Gaul, 170 Pa. 545. It is not contended that the appraisement was conclusive upon the question of value, but it was a necessary step in the proceedings which the defendant himself had instituted, and showing, as it did, the assets in the hands of the assignees for the payment of debts, it was a link in the chain of evidence to prove insolvency. Having been made within so short a time after the bank closed its doors, and taken in connection with the deeds of assignment, which recite that by reason of losses and misfortunes the assignors were unable to pay their debts, we cannot say that it was wholly inadmissible as against the defendant. We may remark further, that the admission of the inventory was quite as important for the defendant as for the commonwealth; for without it there would have been no definite and satisfactory evidence of the quantity of real estate owned by the defendant at the time of the assignment. The sixth assignment of error is overruled.

The eighth, ninth, tenth, eleventh, twelfth and fourteenth assignments may be considered together. They relate to the rejection of questions asked upon cross-examination of Geo. Boak, a witness for the commonwealth, concerning the price received for adjoining lands sold to the L. V. R. R. Co., and their value, as compared with that of the defendant's lands. Notwithstanding the rulings of the court now complained of, the defendant succeeded in obtaining from the witness an admission that, in 1893, the defendant's lands were as valuable per acre as those of the L. V. Co., but it also appeared that the sale to that company was made between 1880 and 1890. It needs no argument to show that the court committed no error in rejecting evidence of the price received at that sale. It was too remote in time to furnish a standard by which to measure the value of the defendant's lands in 1893 or thereabouts. These assignments are overruled.

The questions asked by the court, specified in the seventh and thirteenth assignments of error, were entirely proper. The

witness had testified that he was a lumberman and familiar with the selling price of land in that vicinity, and was very familiar with these lands. His preliminary examination clearly showed him to be a competent witness under the rules laid down in Galbraith v. Philadelphia Co., 2 Pa. Superior Ct. 359, and Orr v. Gas Co., 2 Pa. Superior Ct. 401, and the cases there cited.

Nor, viewing as a whole the examination and cross-examination of the witness, was there clear error in the rulings complained of in the fifteenth, sixteenth and seventeenth assignments. The object of these questions was to obtain from the witness a definite answer as to what he included in his estimate. They were in the same line as that pursued in the cross-examination. The extent to which a party will be permitted to re-examine his own witness is a matter largely within the discretion of the trial judge. The manner in which this witness was examined on both sides resulted in eliciting from him confused, and, in some instances, apparently contradictory answers. But the weight to be attached to his testimony was a question for the jury. While we do not approve the seesawing method of examination, we discover no such gross irregularity, or abuse of discretion by the trial judge, as would justify a reversal of the judgment. Even if the land was worth several times the value which the witness put on it, still the defendant would have been an absolutely insolvent man.

In Com'th v. Junkin, 170 Pa. 194, it was said by Mr. Justice DEAN: "There are three essential elements, which the commonwealth must prove beyond a reasonable doubt before the jury can find the guilt which the act makes punishable: 1. Actual insolvency at the time the money is received. 2. Knowledge of the insolvency. 3. The receipt of the money as a bank deposit." We are of opinion that the commonwealth furnished sufficient proof of all these essentials to warrant the submission of the question of the defendant's guilt to the jury.

The first assignment of error relates to the order of court of April 27, 1895, directing the grand jury for August sessions to meet on June 10, 1895.

The validity of this order, and of indictments found by the grand jury which was summoned and met pursuant thereto, depends upon the construction of the Act of March 18, 1875, P. L. 28. The first section authorizes the judges to fix the

terms of courts and the times for holding the same, and directs that such order and all modifications or changes thereof shall be published " at least thirty days before the time so fixed for the taking effect of said order." Section 2 reads as follows : " It shall be lawful for the said judges, whenever the times for holding the terms of the courts of oyer and terminer, and courts of quarter sessions of the peace have been established as aforesaid, to direct that the grand jury for any of the said terms shall be summoned, in the same manner as required under existing laws, to meet at such time prior to the holding of said term as the judges of the said courts shall deem expedient; and if, in the opinion of the said judges, the business of the said court at any time shall require it, the grand jury may be detained for an additional week, without the issuing of a new venire, and the attendance of prosecutors and witnesses may be enforced, during such additional week, by all proper orders and process." The third section provides that constables, aldermen and justices of the peace shall make all such returns, as they are required to make, on the day fixed as aforesaid for the meeting of the grand jury.

There is nothing in the act to sustain the contention that, if the grand jury are directed to meet before the regular term, it must be the week before, so as to make a continuous session. The language of the act is, " at such time prior to the holding of said term as the judges of the said courts shall deem expedient." It is left to the discretion of the judges ; and the practice in many of the counties of the state is to have the grand jury meet more than a week prior to the first day of the term, so as to allow an interval after the completion of their labors within which the district attorney may prepare a trial list for the regular term. Indeed, this was found to be so necessary in counties where there is a large volume of criminal business that it had very much to do with the passage of the act. Expense is saved, and the convenience of defendants, prosecutors and witnesses, is served thereby.

Whether or not, under the power to detain the grand jury for an additional week, the court may direct them to reconvene at a later time than the next succeeding week, is a question which does not arise in this case. Its decision either way would not affect the defendant. The indictments against him were

found at the first meeting of the grand jury, and, so far as his rights are concerned, it is immaterial whether the subsequent meeting was regular or irregular.

It is argued that the court had not authority to appoint a special or adjourned session and summon a grand jury therefor. We are of opinion that this is a correct construction of the several statutes authorizing the court to appoint special or adjourned sessions. Prior to the act of April 22, 1850, there was no authority to appoint such sessions for the transaction of business requiring the intervention of a grand or petit jury: Mills v. Com'th, 13 Pa. 627. The last mentioned act and the local act of 1852 authorized the court to fix adjourned or special sessions for the trial of issues pending, and by implication the authority to summon a grand jury for such sessions was excluded. But it by no means follows that the grand jury for a succeeding term may not lawfully be directed to meet at the same time that the court is holding a special or adjourned session for the trial of indictments found at preceding terms. If the court had authority to direct the grand jury for August term to meet on June 10th, the fact that the meeting coincided with a special or adjourned session did not render the order invalid. Its functions were to return indictments triable at the regular August term. The court must of necessity be in session to receive the returns, and the fact that it was at the same time engaged in the trial of indictments found by preceding grand juries does not affect the validity of the indictments against the defendant. If the court had undertaken to try those indictments prior to the regular term, a different question would be presented.

The general rule of the court below, that grand juries should meet on the first day of the term, was unnecessary; it was a mere repetition of what the law would have required if the rule of court had not been adopted. The case is precisely the same as if the rule were silent as to the time of the meetings of the grand juries for the several terms. The fact that when the rule was framed the judges were of opinion that there was no occasion for the exercise of the power conferred by the 2d section of the act, was no reason why they should not exercise that power when, in their discretion, a proper occasion did arise.

At first glance it might seem that, in conferring this discretionary power upon the court, the legislature contemplated only

a general order fixing a regular time for the meeting of the grand jury for each term. Upon a more careful reading of the section, however, it will be seen that it does not necessarily require that construction. The power given is " to direct that the grand jury for any of the said terms shall be summoned . . . . to meet at such time prior to the holding of said terms as the judges of the said courts shall deem expedient." There are many counties in the state where, ordinarily, it would not be necessary nor expedient to have the grand jury meet prior to the regular term, but where special circumstances might arise making it desirable that the grand jury for a particular term should be so convened. In the opinion of the court below there was a necessity for the grand jury to meet before the first day of the term, in order to prevent a failure of public justice, and the bill was sent before them by the permission of the court. The whole question turns, therefore, upon the construction of the statute. Its language seems to confer the power claimed by the court below, and no sufficient reasons are shown for not giving to the language its plain and ordinary meaning. The power to direct the grand jury to meet prior to the first day of a particular term is placed where it is not likely to be exercised, except where there is a real public emergency therefor, and it is not apparent that it was abused in the present instance.

But it is argued that the order of April 27 was a modification or change of the order or rule of court fixing the number of the regular terms, and establishing the time for holding the same, and should have been published at least thirty days before the time so fixed for the taking effect of the order.

The question as to the power of the court to make the order fairly arises upon the record proper, but the question as to the invalidity of the order, because it was not published, involves matters of fact which could only be brought upon the record by a bill of exceptions. The order refusing the motion to quash was not excepted to in the court below; therefore, in passing upon the assignment of error to that order, we can look only at the record proper : In re Pottstown Borough, 117 Pa. 538 ; Bank v. Earley, 113 Pa. 477–482 ; Shaffer v. Eichert, 132 Pa. 285 ; Com'th v. Ware, 137 Pa. 465 ; Bradwell v. R'way Co., 139 Pa. 404 ; Stockham v. Boyd, 22 W. N. C. 118 ; s. c. 11 Cent. Rep. 187. As it does not affirmatively appear by the

record that the order was not published, the legal presumption is that it was (if it was necessary) upon the principle omnia præsumuntur rite esse acta. The omission, in the order, expressly to direct publication does not raise a contrary presumption. Any other construction of the act of 1875 would be intolerable. For example, the record before us—as printed at least—does not show affirmatively that the order fixing the number of regular terms, and the times for holding the same, was published as directed by the act of 1875, but, surely, no one would contend that an appellate court would be warranted in reversing and annulling what was done at any of those terms upon the ground that the order establishing them was invalid for want of due publication, where the latter fact did not affirmatively appear of record.

Again, the order of April 27, was not, strictly speaking, a modification or change of the original order with respect to the number of the regular terms and the time of holding the same. These remained unchanged, and, construing the statutory provision as to publication literally, a plausible argument might be made that it does not apply to a modification or change of the original order in other particulars. But in view of the provisions of the third section and the manifest purpose of the legislature in directing publication, perhaps this is too literal a construction of the provision. Without expressing a more decided opinion upon that question, let us assume that the order should have been, but was not, published. Was the grand jury, because of this failure strictly to comply with the direction of the statute, an illegal body, without authority to act on bills sent before it ? The only ground upon which this question can be answered in the affirmative is that the provision of the statute is imperative, and that a failure to publish the order renders everything done in pursuance of it void. As has more than once been remarked, it is not easy to lay down any general rule as to when the provisions are merely directory and when mandatory or imperative, and it is difficult to reconcile all the cases upon the subject. But there is authority for saying that where the words are affirmative, and relate to the manner in which power or jurisdiction vested in a public officer or body is to be exercised, and not the limits of the power or jurisdiction itself, they may and often have been construed to be directory :

Bladen v. Phila., 60 Pa. 464 ; Magee v. Com'th, 46 Pa. 358 ; Pittsburg v. Coursin, 74 Pa. 400 ; Dewhurst v. Allegheny, 95 Pa. 437 ; Smith v. Kingston Borough, 120 Pa. 357, 360. If the question of the publication of an order like the one in question is a jurisdictional one and always open to proof, the slightest irregularity in the publication would be as fatal as entire omission. The consequences which would flow from such a construction of the statute are such as to cause us to hesitate before adopting, and applying it to a case where the party complaining of the irregularity was in no way injured thereby.

But it may be said that the purpose of the provision is to give notice, and that for want of such notice the defendant may have lost the opportunity to interpose challenges to the array, or to individual members of the grand jury. If it appeared that he had any grounds for such challenges it might be necessary to consider whether, if he was prevented from interposing them at the proper time, he would not have the right to assign them as a reason for quashing the indictment. But no such question is presented. The grand jury that found these bills was constituted precisely as it would have been had it met on the first Monday of the term, and there is no allegation that any of its members were disqualified generally, or were disqualified by reason of prejudice, interest or otherwise to act impartially upon the defendant's case. That in extraordinary cases an indictment may be found without previous notice to the accused is well settled. The remarks of Justice AGNEW upon this general question are peculiarly applicable to the present discussion. " It has never been thought that the 9th section of the 9th article of the Constitution, commonly called the Bill of Rights, prohibits all modes of originating a criminal charge against offenders, except that by a prosecution before a committing magistrate. Had it been so thought, the court, the attorney general, and the grand jury would have been stripped of powers universally conceded to them. In that event the court could give no offence in charge to the grand jury, the attorney-general could send up no bill, and the grand jury could make no presentment of their own knowledge, but all prosecutions would have to pass first through the hands of inferior magistrates ; for in all the instances mentioned the defendant could not be heard by himself or his counsel, demand the nature or cause of accusation,

or meet the witnesses face to face, until after the bill had been found by the grand jury:" McCullough v. The Commonwealth, 67 Pa. 30. "That this can be done is undoubted. And there are occasions where such an exercise of official authority would be just and necessary; such as where the accused has fled the justice of the state, and an indictment found may be required previous to demanding him from a neighboring state, or where a less prompt mode of proceeding might lead to the escape of a public offender:" Rowand v. Com'th, 82 Pa. 405. See also Harrison v. Com'th, 123 Pa. 508; Com'th v. Green, 126 Pa. 531; Davidson v. Com'th, 5 Cent. Rep. 484; Traviss v. Com'th, 106 Pa. 597.

Our conclusions may be summarized as follows:

First, the court of quarter sessions had authority under the act of 1875 to make the order of April 27, 1895, requiring the grand jury for the August term of that year to meet prior to the first day of the term.

Second, the fact that the meeting of the grand jury thus ordered was coincident with a special or adjourned session did not invalidate the order nor convert such special or adjourned session into a regular term.

Third, omission to publish the aforesaid order in two newspapers thirty days prior to the meeting of the grand jury was not, standing alone, legal ground for quashing an indictment found by the grand jury at such meeting.

Fourth, even if such publication was necessary to give validity to the acts of the grand jury, it is to be presumed on appeal, in the absence of affirmative record evidence to the contrary, that the order was duly published, upon the principle, omnia præsumuntur rite esse acta.

For these reasons the first assignment of error is overruled.

The reasons given by the court for sustaining the objections to the questions asked C. E. Graybill on cross-examination, and specified in the third and fifth assignments, fully vindicate the rulings complained of. As to the question specified in the fourth assignment it is sufficient to say that Graybill's belief as to the solvency of the firm was not a fact material in the issue being tried; nor was it made material by anything he had testified to in chief. Besides that, if the fact was of any importance, no harm was done the defendant by sustaining the

objection to this particular question, because the witness had already testified on cross-examination that, assuming that the defendant's individual property was liable, he never knew that the bank was insolvent. Thus the defendant had the substantial benefit of the testimony, notwithstanding the ruling complained of. This disposes of all of the assignments, and finding no error in the record the judgment must be affirmed.

The judgment is affirmed, and it is further ordered that the defendant, E. K. Smith, be remanded, to the end that the sentence of the court below be executed, and that he be confined according to said sentence for the residue of the term which had not expired on the 20th day of April, A. D. 1896, the date of the suspension of the sentence; and that the record be remitted that the sentence and this order be carried into effect.