## H. F. SIVELY v. STATE.

### [65 South. 118.]

BANKS AND BANKING. *Criminal offenses. Receiving deposits after insolvency.*

Where pending a decision of the board of directors to liquidate the bank because of its financial condition, the cashier received all deposits offered, but kept the same separate from the funds of the bank by pinning the money received from each depositor to the deposit slip and placing the same in a box, and after the appointment of a receiver, the identical money was returned to each depositor with a single exception, and where the failure of that depositor to call for and receive his deposit was the result of his failure to receive a notice to call at the bank and receive his deposit, in such case the cashier did not receive any deposit in violation of the statute.

APPEAL from the circuit court of Newton county.

HON. C. L. DOBBS, Judge.

H. F. Sively was convicted of receiving deposits in an insolvent bank, and appeals.

The facts are fully stated in the opinion of the court.

*R. N. Miller* and *Julian C. Wilson,* for appellant.

*Geo. H. Ethridge,* assistant attorney-general, for the state.

No brief of counsel found in the record.

COOK, J., delivered the opinion of the court.

Appellant was indicted and convicted for receiving a deposit of seventy dollars while he was acting as cashier of a bank he knew was insolvent, or had good reason to believe was insolvent, without informing the depositor of the bank's financial condition. There is a controversy about the insolvency of the bank at the time of the alleged deposit, but, in considering the question as to whether or not appellant received a deposit in the sense of the statute the insolvency of the bank will be assumed.

On the evening of the 18th day of June, 1912, the father of appellant, a director of the bank, left his home in Jackson, and went to Newton, where the bank was located, for the purpose of consulting with his associate directors about the condition of the bank. It appears that there were then reasons to believe that the bank was not in a prosperous condition, and it was necessary for the directors to take some action looking to the future government of same, and no doubt, appellant's father believed the bank would be liquidated. The directors of the bank were in session on the 19th and 20th of July, and on the latter date the decision to liquidate the bank was reached, and an order to this effect was entered on the minutes of the governing board.

In the meantime, on the 19th and 20th, the cashier (appellant) kept the doors open and received all deposits offered, but, upon the advice of his father, all deposits so received were kept separate from the funds of the bank; the identical money received from each depositor being pinned to the deposit slip and placed in a tin-box.

After the appointment of a receiver the identical money received during the two days was returned to each depositor, except the deposit of seventy dollars upon which the

indictment was based. The record shows that the depositor was notified by mail to call and the seventy dollars would be returned to him, but by some misadventure the depositor did not receive the notice, and the indictment naturally followed.

In short, pending the examination of the financial condition of the bank and the final action of the board of directors, the deposits were received in the manner stated for the purpose of returning same should the directors decide to liquidate. The depositors were not advised of this purpose of the bank, and, so far as they were concerned, the deposits were made and received in the ordinary way.

Two courses were open to the officers of the bank pending the decision of the directors; one to close the doors and refuse to receive deposits; the other the one pursued in the instant case. If deposits had been declined, a run on the bank was reasonably certain, and this probably would have put this bank, or any other bank, in the hands of a receiver, solvent or insolvent. It is easily conceivable that a bank solvent in the legal sense would be wrecked by a refusal to receive deposits; confidence once weakened is difficult to revive.

The question is, conceding that the cashier had good reason to believe the bank was insolvent when Mr. Atkinson delivered his money to the cashier: Did the cashier, under the facts of this case, "receive any deposit" in violation of the statute?

According to the undisputed intention and purpose of the cashier, the money received was not to become a deposit in case it was decided to liquidate. It was the undisclosed intention and purpose of the cashier to take the money conditionally. He never, in fact, received the money for the bank, and never mingled same with the bank's funds, nor did he record the transaction upon the bank's books. There seems to be no reason to doubt that appellant as cashier endeavored to protect the in-

terest of the depositor should disaster come. In other words, the record leaves no room for doubt of the cashier's intention to prevent any loss to individual depositors during the two days the board of directors were diagnosing the sick bank.

Under a state of facts similar to the facts in the present case, construing a statute in all essentials the same as ours, the supreme court of Pennsylvania, in *Commonwealth* v. *Junkin,* 170 Pa. 201, 32 Atl. 619, 31 L. R. A. 124, said: "Putting aside for the present the question raised as to Junkin's unanswerability criminally for the acts of his agent, assume that he had himself been in the bank that day, had personally received this twenty dollars at the counter, and had put it in an envelope, marked with Rice's name, to be returned to him in case the bank closed, and then did return to him the same twenty dollars, would that, within the meaning of the act, have been the receipt by a banker, knowing the bank to be insolvent, of money on deposit? The peril to and loss of the depositor's money arises from the concealed insolvency of the bank; but if it never mingles with or forms part of the bank's funds, which are assets for the payment of creditors generally, remains separate from all other funds, and is capable of absolute identification, so that it may be returned, and is actually returned, that does not constitute the criminal receipt of money as a bank deposit. The real deposit, whether on time or call, when passed over the counter, is thereafter the property of the bank absolutely. It is the intention of the depositor and the bank that the latter shall thereafter use it as its own by loaning it to others, and paying it out on checks drawn by others. The express or implied promise of the bank is that it will repay him, not that money, but that amount of money. In the case we are supposing the intention of the banker is to hand back the identical money received, and that intention is manifested, not by what he says, but by what he does, not only at the time, but

afterwards. This method of not receiving money on deposit by a banker knowing his insolvency, as demonstrated by the event here, is not an open, unequivocal observance of the law. He subjects himself to the peril of misconstruction of his real intention, and invites criminal accusation. But, unwise as may be the conduct, if no intention, in fact, existed to appropriate in aid of his insolvent bank the depositor's money, and he did not, in fact, so appropriate it, he is not a criminal. If such a transaction is not a deposit by a depositor, if there be no contract to which the minds of both parties assented, then it is not within the terms of the act."

In *State* v. *Strait*, 99 Minn. 327, 109 N. W. 598, the supreme court of Minnesota has this to say: "It is argued on behalf of the state that it was immaterial what effort appellant may have made to prevent the deposits being made, so long as it did not, in fact, result in the actual return of the money to the depositors; that what his intention may have been was immaterial, and he was bound absolutely by the technical legal result of his cashier permitting the money to remain in the bank and pass into the hands of the referee. Such is not our view of the law." This court also quotes with approval *Commonwealth* v. *Junkin, supra.*

In the last analysis the question to be decided in the present case is about this: Was appellant a felon when he took Mr. Atkinson's money, having good reason to believe that the bank was insolvent at the time, even though he intended to receive, and did, in fact, receive, the money as a special deposit, for the purpose of giving the directors an opportunity to kill or cure the bank, and in the former event it was his purpose to restore the money to Mr. Atkinson?

There are many ways by which the creditors of a hopelessly insolvent bank may be made secure, and there are also many ways by which a bank unable to meet all legal demands of creditors may be rejuvenated and put upon

its feet. It may have been, and probably was, the hope
of the bank's officers that some way would be found to
continue the operation of this bank upon a basis of sol-
vency, so far as creditors were concerned, but, whether
this is true or not, it is manifest that the cashier acted
in perfect good faith with the depositor, by so arranging
matters as to insure the return of his money in any event.

The statute is a wise and just law for the protection
of bank depositors, but to hold that appellant violated
this statute when he did the very thing the statute was
designed to accomplish would be a sacrifice of the spirit
to the letter of the law.

Mr. Atkinson has suffered no injury; the money de-
posited by him never became an asset of the bank, and
should have been returned to him.   Michie, Banks and
Banking, 406.

Reversed, and judgment here discharging appellant.

*Reversed.*

SMITH, C. J., delivered a dissenting opinion.

The jury found, as a fact, and the majority opinion
concedes for the purpose of this discussion, that at the
time the deposit in question was received the bank was
insolvent, and that appellant either knew or had good rea-
son to believe that this was true. The money was re-
ceived by the bank in the usual and ordinary way, and
became, immediately upon its receipt, the property of the
bank.

Appellant claims that it was the bank's intention to
return the money to the depositor in event it should be
determined by its directors that it was necessary for the
bank to discontinue business. In other words, his claim
is that the deposit was received without any intention
of defrauding the depositor. The defect in this defense
is that the presence or absence of an intent to defraud
is immaterial; for the statute makes it unlawful to re-
ceive a deposit into an insolvent bank with knowledge of

its insolvency without reference to the intent with which the deposit was received. If a fraudulent intent is necessary, few convictions can be had under this statute, for the reason that, I think I am safe in saying, few deposits are received with an intention on the part of the bank officials of defrauding the depositor. Insolvent banks are usually kept open because of the fact that, should they discontinue business, it is hardly possible for them to realize the value of their assets, and because of the hope of their officials that they will in the end recoup their losses and be enabled to discharge all of their liabilities and save harmless their stockholders. The statute was designed to prevent insolvent banks from pursuing this course, to prevent them from continuing to receive, and subject to probable loss, the money of unsuspecting depositors. What happened here is just what the statute was designed to prevent; for the depositor has lost his money when, had he been told of the insolvency of the bank, he could have prevented the loss by not making the deposit.

It is true that by a proper proceeding this depositor could have recovered the particular money deposited by him while it remained in the hands of the bank, but this results not from the fact that there existed an intention on the part of the bank officials to return it to him in event a certain condition should arise, but results from that principle of law which permits a fraudulent contract to be repudiated by the innocent party and which then revests him with the ownership of property obtained from him by virtue of the fraudulent contract. Any depositor whose money has been received by a bank when insolvent, to the knowledge of its officials, can recover it while it remains in the hands of the bank, provided the insolvency of the bank was unknown to the depositor at the time the deposit was made. If authority is desired for this statement of the law, see 1 Bolles, Modern Law of Banking, 188, and, as illustrating the principle, *Bank* v. *Strauss,* 66 Miss. 479, 6 So. 232, 14 Am. St. Rep. 579.

The statute here under consideration was construed in accordance with the views herein expressed in *Hughes* v. *Like*, 63 Miss. 552. In that case, "L., a banker, having failed in business and made an assignment, H., one of his depositors, sued out an attachment against him on the ground that the debt due the plaintiff was 'fraudulently contracted.' On the trial of the issue joined to test the ground of the attachment the plaintiff adduced evidence tending to show that L. knew at the time he received plaintiff's deposit that the bank was insolvent." The plaintiff asked, but was refused, "an instruction to the effect that, if L. was guilty of violating the statute (the one here in question in receiving H.'s deposit, then he fraudulently contracted the debt therefor." This court affirmed the action of the trial court in refusing this instruction, and, speaking through Judge CAMPBELL, pointed out the distinction between the civil and criminal liability of a banker for receiving a deposit into his bank knowing it to be insolvent, as follows: "The first instruction asked by the plaintiff was properly refused, and was correctly modified by the court. It is true that one may be guilty, and sent to the penitentiary, under paragraph 2814 of the Code, without having entertained the fraudulent purpose necessary to sustain an attachment. Guilt, under paragraph 2814, depends on the facts recited in it, and not upon intent or purpose. The object of the statute is to protect the confiding public from the victimization apt to result from depositing in an insolvent establishment, and it seeks to give protection by denouncing its penalty against him who receives a deposit, knowing, or having good reason to believe, that the establishment is insolvent, without informing the depositor of such condition. Receiving a deposit in such circumstances constitutes the crime, no matter what may be the purpose or hope of the person receiving it. He may think all will be well, and that his insolvent condition will never be known, and that he will achieve success by the use of his

credit, and his purpose may be to act honestly and pay all depositors, but, if he receives a deposit, knowing or having reason to believe that insolvency exists, he is guilty of a felony, and cannot escape the just consequences of his crime because of his hopes and purposes. The legislature has determined that it is dangerous to the community for an insolvent bank to receive deposits, because of the probable result, and, in order to prevent the evil, has declared it felony for any person to receive deposits into an insolvent establishment without informing the depositor of such condition. No professed or really existing honesty of purpose will relieve against the crime, which consists in doing what is forbidden, regardless of motive. If the bank is insolvent, dare not to receive a deposit from an unsuspecting person, but tell him of the insolvent condition, that he may foresee the evil and avoid it." It is true that the criminal liability of the defendant was not there in question, but it was necessary in order that the court might intelligently decide the matter before it for it to draw the distinction between civil and criminal liability under the statute, and, while it may be that the construction there placed upon the statute is not binding upon us, it expressed the views of a very able court, and, in my judgment, is correct. The statute has been twice re-enacted since that case was decided, and for that reason the views therein expressed, whether necessary to the decision or not, should not be lightly disregarded.

Only two cases have been cited in support of appellant's contention, and these are the two referred to in the majority opinion, to wit, *Commonwealth* v. *Junkin,* 170 Pa. 194, 32 Atl. 619, 31 L. R. A. 124, and *State* v. *Strait,* 99 Minn. 327, 109 N. W. 598. The first decision seems to proceed upon two grounds: (1) That the deposit was received without any intention to defraud; and (2) that no deposit was, in fact, made, for the reason that the person receiving the deposit secretly intended to return it. The

ground on which the second case proceeds is not clearly stated, but it refers to the first as authority for the conclusion reached. I have already discussed the first ground on which *Commonwealth* v. *Junkin* proceeds, and do not deem the second worthy of consideration, for the reason that no other cases have come under my observation wherein it is held that a contract can be modified or changed by reason of an intention on the part of one of the parties thereto different from that expressed in the contract and not disclosed to the other party. In the case of *State* v. *Strait*, the deposit there in question had been received by the cashier and mingled with the money of the bank before he was notified by Strait, one of the owners of the bank, to put all money received on deposit in envelopes marked with the names of the depositors, so that it might be returned to them. An amount of money equal to the deposit in question was then put in an envelope, marked with the depositor's name, and, though by an oversight it was not returned to the depositor, the court held that no crime had been committed. It would follow from this that no conviction can be had if the debt which the bank owes the depositor by reason of his having made the deposit is afterwards paid. At least one statute has come under my observation which contains a provision to the effect that loss to the depositor must result from the reception of the deposit in order for a crime to be committed, but the statute here under consideration contains no such provision.

It may be, and I am inclined to think, that the statute should be amended so as to provide for the doing of what was done by appellant here, but that is the province of the legislature, and not of the court. Should the statute be so amended, the amendment should be so framed as to protect the rights of the unsuspecting stockholder, as well as of the person receiving his deposit.

For these reasons, I think the judgment of the court below should be affirmed.

REED, J., delivered a concurring opinion.

The chief justice, in his dissenting opinion, referring to the alleged deposit, says that "the money was received by the bank in the usual and ordinary way, and became immediately upon its receipt the property of the bank." I cannot agree that this is shown by the proof. I understand from the evidence that Mr. Atkinson handed to appellant, the cashier of the bank, to be deposited, seventy dollars in currency, consisting of one twenty dollar bill and ten five dollar bills, and received a duplicate deposit ticket therefor. This currency was taken by appellant, pinned to a deposit slip, placed in a tin box set apart to receive sums left by others on the same day, and never entered upon the books of the bank as a deposit nor mingled with its general funds. All of the other money left with the bank by other parties was returned after the bank's failure, except the amount which was handed in by Mr. Atkinson. It appears that the different persons were notified to call and get their money, and that Mr. Atkinson failed to receive the notice mailed to him.

I understand that Mr. Atkinson's money went into the hands of the temporary liquidator of the bank, and was afterwards turned over to the receiver, and was brought into court on the trial of this case. During all of this time it was kept separate from other funds, and kept just as it was received by appellant.

The record shows that appellant did physically receive this money over the counter and into his possession, but it is not shown that when it came into his hands it was treated and disposed of as an ordinary deposit in the bank and as the property of the bank. Appellant kept it separate and apart from the funds of the bank, and purposed and endeavored to return it to Mr. Atkinson. Mr. Atkinson did not receive information as to this. However, appellant is not on trial for failure to tell Mr. Atkinson of his purpose to keep the money separate and apart from the funds of the bank and return it in the

event of the bank's failure. The offense charged against him is receiving a deposit into an insolvent bank.

Was this such a deposit as is meant by the statute? Surely the statute means a general deposit; that is, the placing of money in a bank to be repaid on demand "in any current money not the same pieces of money deposited." In such deposit the title to the money deposited passes to the bank, which becomes the debtor to the depositor for the amount. Black's Law Dictionary. It was undoubtedly the purpose of Mr. Atkinson, when he presented his money to the appellant, to make a general deposit in the bank, but the making of such deposit does not consist alone of the act of the one who desires to deposit his money. The amount offered must be received into the bank. It must become a part of the bank's funds. The entire transaction between the two parties is that which constitutes the contract of deposit. If a contract, the minds of the parties thereto must meet. I do not find that this was so in this case. Mr. Atkinson purposed to make a general deposit, but appellant did not, on his part, receive it as such. Their minds did not meet. The contract of a general deposit was not completed.

I do not know that we can term the transaction between Mr. Atkinson and appellant as amounting to a deposit. If it can be, from any view, termed a deposit at all, then I see in it a special deposit; that is, "one in which the depositor is entitled to the return of the identical thing deposited (gold, bullion, securities, etc.) and the title to the property remains in him, the deposit being usually made only for purposes of safe-keeping." Black's Law Dictionary, citing *Shipman* v. *State Bank,* 59 Hun, 621, 13 N. Y. Supp. 475; *State* v. *Clark,* 4 Ind. 318; *Brahm* v. *Adkins,* 77 Ill. 263; *Marine Bank* v. *Fulton Bank,* 2 Wall. 252, 17 L. Ed. 785.

In discussing what is a special deposit, Mr. Bolles, in his treatise on the Modern Law of Banking, vol. 1, p. 434, says: "The term 'special deposit' has a varying judi-

cial meaning. Thus a court in Illinois, when saying that a special deposit must always be returned to the owner, whether the bank is solvent or otherwise, meant a specific thing, like a bond or a specific deposit of money. To these may be added deposits marked 'special,' or which are put into a special place at the time of receiving them, because of the bank's pending insolvency, or other reason.''

The facts in this case clearly show to me that this money was received into the bank by appellant, and treated and held as the property of Mr. Atkinson, and that the title thereto did not pass to the bank, but remained in him. The bank did not become his debtor for the amount. It was not a general deposit "received by the bank in the usual and ordinary way.'' It was not the receiving of money into the bank as a deposit, which is made a criminal offense by statute.

The chief justice quotes at length from *Hughes* v. *Lake,* 63 Miss. 552, and I gather from what he writes that he relies upon the discussion of the purpose of the statute in the opinion in that case to sustain his views in the present case. I do not see how this case can, in any manner, be controlled by the decision of the court in *Hughes* v. *Lake.* The eminent judge who delivered the opinion did very fully express his approval of the statute. I am sure we all agree that the proper enforcement of the statute will be very helpful in protecting the confiding depositors from losing their money. I believe that the great man had in mind, while writing the receiving of an ordinary or general deposit into an insolvent bank. That is what is forbidden. The wrong act condemned by the law is the taking of money from a depositor into the funds of an insolvent bank, and thereby causing him loss. The depositor must be defrauded or injured by the taking of his money. This will be so if it is taken into an insolvent bank as a general deposit and mingled with the funds of the bank. It will not be so if the money is

received by a teller, and not taken into the funds of the bank, but kept separate and apart as the property of the one offering to deposit it, and so that the identical money may be returned to him. We may approve the sentiments expressed by the judge delivering the opinion in the case of *Hughes* v. *Lake* without in any manner recognizing that there was anything decided in that case to control the case at bar.

The chief justice says in his dissenting opinion that only two cases have been cited in support of appellant's contention. We learn from the able and painstaking counsel who represent appellant that a very thorough search of the books only disclosed two cases in point. It is significant that both of these cases sustain the position of the majority opinion in this case. The case of *Commonwealth* v. *Junkin*, 170 Pa. 194, 32 Atl. 619, 31 L. R. A. 124, is very like the present case. This is shown in Judge COOK's reference to that case and his quotation from the opinion therein.

I think the case of *State* v. *Strait*, 99 Minn. 327, 109 N. W. 598, also fully sustains the decision in this case. Judge COOK quoted from the opinion, and Judge SMITH referred to the facts, in that case. I will presume to make a more extended quotation, including that already made, because I deem it very pertinent in this consideration, and helpful in reaching a right conclusion in this case: "The cashier testified that he followed appellant's instructions, put the amount (though he could not say it was the identical money) received by the two depositors that morning in separate envelopes, addressed to the respective depositors, and laid the same in the safe. It appears that after closing of the bank, but before the money had been returned to the two depositors, a committee representing the bank's depositors, headed by the county attorney, visited the bank, and in the excitement the actual delivery of the envelopes was overlooked, and the receiver in bankruptcy took charge of appellant's estate, including the

bank and its contents. We will assume that the referee in bankruptcy acquired title to the money for the creditors as against the depositors, so that, conceding there was technically a deposit, in the sense that the depositors lost title to their money, yet is the inference warranted from the facts and circumstances stated that there was a deposit such as to constitute the criminal offense contemplated by chapter 219? It is argued on behalf of the state that it was immaterial what effort appellant may have made to prevent the deposits being made, so long as it did not, in fact, result in the actual return of the money to the depositors; that what his intention may have been was immaterial, and he was bound absolutely by the technical legal result of his cashier permitting the money to remain in the bank and pass into the hands of the referee. Such is not our view of the law. We are decidedly of the opinion that, if the evidence referred to is true, appellant took every reasonable precaution which could be taken to prevent the occurrence of the very act for which he stands charged in the indictment. The inevitable inference from the declarations and acts of appellant, and from all the evidence, is that the accused did not willfully or negligently receive, or permit his agents to receive, the money."

I do not see that the proof in this case is sufficient to support the conviction of appellant for violation of the statute.